UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| GRETCHEN HILLENBRAND and JOHN ARLT, Individually and on behalf of M.A. and T.A., as natural guardians, | Civ. No. 16-5007-KES |
| Plaintiffs, | |
| v. | **Brief in Support of Motion for Summary Judgment** |
| WELLMARK OF SOUTH DAKOTA, INC., | |
| Defendants. | |

Plaintiffs respectfully submit this Brief in Support of Motion for Summary Judgment.

## Factual Background

Gretchen Hillenbrand ("Gretchen") is an enrolled member of a Blue Select health plan ("Plan") and a Blue Rx Preferred prescription drug benefit plan for families and individuals operated by Wellmark of South Dakota, Inc. ("Wellmark"). Administrative Record ("AR"): 633. Gretchen's husband, John Arlt ("John") and her two children, M.A. and T.A., are on the same Plan. *Id.* at 633, 1994, 3244, 4126. Blue Select health plans are designed to pay for hospital, medical, and surgical expenses incurred as a result of a covered illness or injury. *Id.* at 89-181. The Plan is provided by the employer group Dakota Partnership (DBA "Triple Seven Ranch"). *Id.* at 633. The Plan is maintained by an employer and is subject to the Employee Retirement Income Security Act of 1974 ("ERISA"). *Id.* at 167. The Blue Select and BlueRx Preferred Coverage Manual ("Manual") defines covered benefits under the terms of the Plan. *Id.* at 89-181.

Page **1** of **23**

Gretchen and her family suffer from a multitude of health conditions that require continued monitoring and regular treatment. *Id.* at 231, 2365, 1799, 3965, 433, 4354. Gretchen has been diagnosed with several autoimmune diseases including Hypothyroidism, Ulcerative Colitis and Polychondritis. *Id.* at 231. Gretchen has also been diagnosed with Lyme disease. *Id.* John was diagnosed with Reiter syndrome, a type of reactive arthritis that occurs as a reaction to a bacterial infection in the body. *Id.* at 2365. John has been diagnosed with Lyme disease. *Id.* at 1799. John suffers from debilitating pain that on several occasions has rendered him unable to walk or perform activities of daily living. *Id.*

M.A. was diagnosed with Lyme disease in 2011. *Id.* at 3965. M.A. suffers from stomach pain, leg discomfort, moodiness, sensitivity, lack of energy and cognitive imbalance. *Id.* T.A. was diagnosed with Lyme disease in 2011 and suffers from abdominal pain, chronic fatigue and porphyria. *Id.* at 4133, 4354. Porphyria is a disorder resulting from a buildup of certain chemicals related to red blood cell proteins. *Id.* at 4988. Porphyria affects the nervous system, skin and other organs, and can cause significant problems including kidney failure and liver damage. *Id.*

Gretchen and her family are regularly monitored and treated by Wayne Anderson, N.D. ("Dr. Anderson") and Dr. Eric Gordon ("Dr. Gordon") of Gordon Medical Associates. *Id.* at 441, 1978, 3444, 4134, 4133. Dr. Anderson is a Naturopathic Doctor who focuses primarily on treating patients with chronic conditions, including Lyme disease.[1] Dr. Gordon focuses on integrative medicine to treat chronic conditions.[2] The family regularly treats with Dr. Elliot Blackman ("Dr. Blackman"). *Id.* at 231, 2787, 3246, 4354. Dr. Blackman is a Doctor of Osteopathy who utilizes Osteopathic Manipulation,

---

[1] http://www.gordonmedical.com/
[2] *Id.*

as well as Homeopathy advice on supplements and nutrition to treat his patients.[3]  The family also received treatment and monitoring from Dr. Suruchi Chandra from Whole Family Wellness/ Whole Child Wellness.[4]  *Id.* at 798, 3666, 5326, 6575. Dr. Chandra is a board-certified psychiatrist who specializes in integrative and holistic approaches for treating conditions such as Lyme disease.[5]

Arbitrarily, on or about July 23, 2013, Wellmark began denying benefits for services covered by the Plan and previously paid for by Wellmark.  *See* Supplement to Administrative Record ("SAR"): 1-42. Gretchen (on behalf of herself, John, T.A. and M.A.) was forced to appeal the benefit denials.[6]  Gretchen and her family have appealed 26 denials. *Id.* at 14, 200, 439, 649, 921, 1248, 1461, 1618, 1800, 1977, 2157, 2392, 2784, 3254, 3442, 3717, 3964, 4132, 4319, 4620, 4813, 5010, 5407, 5815, 6151, 6582. Each appeal contains denials for multiple services.  *Id.*

As the administrative record provides, the claim denial process for each claim is nearly identical.  *See Id.* at 1-181.  A medical director would make the initial benefit denial decision (Dr. Jagiello or Dr. Anshul Dixit).  *Id.* at 48. After the adverse benefit decision was sent to Gretchen, Gretchen would file an appeal.  *Id.* at 14, 200, 439, 649, 921, 1248, 1461, 1618, 1800, 1977, 2157, 2392, 2784, 3254, 3442, 3717, 3964, 4132, 4319, 4620, 4813, 5010, 5407, 5815, 6151, 6582.  In each appeal[7], the provider submitted a letter describing the medical necessity of the services provided.  *Id.* at 15, 231, 441, 645, 803, 1464,

---

[3] http://www.do-sf.com/about/blackman/
[4] Dr. Chandra now practices at Suruchi Chandra, M.D., Integrative Psychiatry and Medicine. (http://www.chandramd.com/)
[5] *See* "Physicians and Practitioners" - AR: 113-14.
[6] A factual summary of each appeal is described in Plaintiff's Statement of Undisputed Facts.
[7] With the exception of Appeal 64160 found on pgs. 1188-1436.

1620, 1978, 1799, 2158, 2787 (2773), 2333, 3965, 3246, 3444, 3662, 4133-34, 4318, 4621, 4832, 5052, 5326, 5816, 6187, 6404.  Rarely, did Wellmark ever request additional documentation or records from the provider or Gretchen. *Id.* at 939, 1265, 1627.  On each appeal, the same nurse provided a summary of the services provided (Beth Goebel, RN), and the same physician reviewed each denial decision (Dr. Tim Gutshall), with the exception of one appeal (Dr. Barbara Muller).  *See Id.* at 3-12. Often times, as described in more detail below, Dr. Gutshall would simply cut and paste the same rationale and conclusion into the "Clinical Appeal Worksheet."  *Id.* at 401-09; 675-80; 938-943; 1264-70; 1481-87; 2131-37; 3406-15; 3819-25; 3947-56; 4119-24; 4575-83; 5059-64; 5413-18; 5828-32; 6377-83.  That *rationale* would then be sent to Gretchen and her family by way of the Final Determination letter.  *See Id.* at 31-32.  Despite previously paying benefits for the same or similar services and receiving information about the medical necessity of the services provided, Wellmark unreasonably began denying benefits.  SAR: 1-42.

For the reasons provided below, Wellmark abused its discretion when it denied benefits rightfully due under the Plan.  Wellmark's denial of benefits was unreasonable under the terms of the Plan, and pursuant to the Employee Retirement Income Security Act.  Plaintiffs respectfully request the Court to recover benefits rightfully due to them under the terms of the Plan, and ensure that services are paid for under the terms of the Plan in the future. 29 U.S.C.A. § 1132(a)(1)(B).

## Analysis

### 1.   Standard of Review

The Employee Retirement Income Security Act of 1974 ("ERISA") was enacted to "promote the interests of employees and their beneficiaries in

employee benefit plans." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 113 (1989) *quoting Shaw v. Delta Airlines, Inc.*, 463 U.S. 85, 90 (1983). A participant or plan beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C.A. § 1132(a)(1)(B).[8]

A denial of benefits challenged under 29 U.S.C.A. § 1132(a)(1)(B) should be reviewed *de novo* unless the benefit plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989). When a plan gives the administrator discretion, the appropriate standard of review is abuse of discretion. *Tillery v. Hoffman Enclosures, Inc.*, 280 F.3d 1192, 1196–97 (8th Cir. 2002). Under the abuse of discretion standard the Court should uphold a decision to deny benefits if it is reasonable. *Johnson v. United of Omaha Life Ins. Co.*, 775 F.3d 983, 988–89 (8th Cir. 2014). "We measure reasonableness by whether substantial evidence exists to support the decision, meaning more than a scintilla but less than a preponderance." *Id. quoting Wakkinen v. UNUM Life Ins. Co. of Am.,* 531 F.3d 575, 583 (8th Cir.2008). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. quoting *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 924 (8th Cir.2004).

"Review of an administrator's decision under an abuse of discretion standard, though deferential, is not tantamount to rubber-stamping the result. On the contrary, we review the decision for reasonableness, which

---

[8] Gretchen and her family have exhausted all internal appeal procedures under the terms of the Plan. AR: 2112.

requires that it be supported by substantial evidence that is assessed by its quantity and quality." *Torres v. UNUM Life Ins. Co. of Am.*, 405 F.3d 670, 680 (8th Cir. 2005).  On appeal, "the district court sits more as an appellate tribunal than a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary. . . . [S]ummary judgment is simply a vehicle for deciding the issue. . ." *Jon N. v. Blue Cross Blue Shield of Massachusetts*, 684 F. Supp. 2d 190, 198 (D.Mass. 2010).

> The Manual Provides,
>
> We will interpret the provisions of this coverage manual and determine the answer to all questions that arise under it. We have the administrative discretion to determine eligibility requirements, or to interpret any other term in this coverage manual. If any benefit described in this coverage manual is subject to a determination of medical necessity, unless otherwise required by law, we will make that factual determination.
>
> AR: 169.

Although the Manual provides that Wellmark has discretion to determine eligibility for benefits and to construe the terms of the plan, Wellmark abused its' discretion by regularly denying benefits to Gretchen and her family despite the plain language of the plan and the substantive and procedural requirements of ERISA.

## 2.   Wellmark's denial of benefits was unreasonable.

A showing of reasonableness requires that the decision is supported by "substantial evidence" that is assessed by its "quantity and quality." *Torres*, 405 F.3d at 680 (8th Cir. 2005).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 887 (8th Cir. 2002). The Eighth Circuit considers five factors to determine whether a decision was reasonable:

> (1) whether the administrator's interpretation is consistent with the goals of the Plan; (2) whether the interpretation renders any language in the Plan meaningless or internally inconsistent; (3) whether the administrator's interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the administrator has interpreted the relevant terms consistently; and (5) whether the interpretation is contrary to the clear language of the Plan.

*Id. citing Shelton v. ContiGroups Cos., Inc.*, 285 F.3d 640, 643 (8th Cir. 2002).

As the record provides, Wellmark's interpretation was inconsistent with the goals of the Plan; to pay for eligible services under the plain terms of the Plan. Wellmark's interpretation would render multiple sections in the Manual meaningless or inconsistent, and is contrary to the plain terms of the Manual. Wellmark's interpretation conflicts with the substantive and procedural requirements of ERISA. Wellmark's new interpretation of Plan benefits is inconsistent with Wellmark's previous interpretations. A reasonable mind would not agree that there was adequate evidence to support the denials.

## A.      Wellmark's denials were not supported by "substantial evidence."

A reasonable mind would not agree that there was adequate evidence to support the 26 denials. First, the original denial decision by the medical director was flawed. Secondly, the appeal process was nothing more than a rubber-stamp approval of the original decision.

### 1) The initial denial decision by the medical director was not based on evidence.

In many of the appeals, there was simply a "cut and paste" rationale for denying benefits by the medical director (Dr. Jagiello or Dr. Anshul).  Despite allegedly reviewing the file, Dr. Jagiello would deny benefits for two separate claims (two separate individuals) at the exact same time and for the identical reason.  For example, on February 25, 2014 at 2:21 p.m.  Dr. Jagiello denied benefits for Gretchen and John in two separate files for the identical reasons.[9]  AR: 48, 2010.  Similarly, Dr. Jagiello denied benefits for two (2) services for M.A. on March 5, 2014 at 3:47 p.m.  *Id.* at 3265.  One minute later, at 3:48 p.m., Dr. Jagiello denied benefits for ten (10) services for T.A. *Id.* at 4438.  One minute later, at 3:49 p.m., Dr. Jagiello denied benefits for twelve (12) services for Gretchen.  *Id.* at 263.  The three emails had identical rationales for denying services.  *Id.* at 263, 3265, 4438.  It cannot be said that the medical director relied on substantial evidence before denying benefits if the medical director simply did not review the medical records.

Again, on March 24, 2014 at 9:28 a.m., Dr. Anshul Dixit concluded that services for M.A. (dated January 27, 2014) should be denied because the billing did not support the level of services billed.  *Id.* at 3474-75.  At the exact same time in a different file, Dr. Anshul Dixit denied services for T.A.

---

[9] Decision: deny as investigational

Rationale: The United States Centers for Disease Control and Prevention (CDC) and the United States Food and Drug Administration (FDA) have cautioned clinicians that some commercial laboratories are performing assays for Lyme disease whose accuracy and clinical usefulness have not been adequately established [40]. These tests include urine antigen tests [41], immunofluorescent staining for cell wall-deficient forms of B. burgdorferi, lymphocyte transformation tests, and polymerase chain reaction (PCR) on inappropriate specimens such as blood and urine. (Source: UpToDate)
Bill Jagiello DO

*Hillenbrand et al. v. Wellmark*                                    *Brief in Support of Motion for SJ*
16CIV-05007-KES

(dated January 27, 2014).  *Id.* at 4647-48.  In a completely separate file, Dr. Anshul Dixit sent an email denying benefits for Gretchen (dated January 27, 2014).  *Id.* at 4878.  Oddly, Gretchen's appeal had nothing to do with services rendered for Gretchen on January 27, 2014 (dates of service were November 14, 2013 and December 30, 2013).  *Id.* at 4813.  All three emails are nearly identical in content and were sent at the exact same time (March 24, 2014 at 9:28 a.m.).

It seems unlikely, or impossible, that a medical director could review multiple medical records for different services, review separate files, and draft an informed decision in *mere seconds*.  There is no question that the medical directors failed to review any evidence, but merely denied services simply by copying and pasting a rationale.  In fact, some denials for benefits were made without any review, but simply because similar services were previously denied.[10]  It's clear from the record, that many of the decisions were "copy and paste" denials.  Because the initial determinations had no basis in evidence, Wellmark's "rubber-stamp" technique in the appeal process cannot be upheld.

### 2) The decisions provided in the appeals were simply "rubber-stamp" decisions.

As described above, Dr. Tim Gutshall, of the Medical Review Institute of America, Inc., reviewed 25 of the 26 appeals.  In all of the appeals, he upheld the original decision to deny benefits.  Out of those 25 appeals, he gave nearly identical reasoning for upholding each denial on 15 separate appeals.  *Id.* at 401-09; 675-80; 938-943; 1264-70; 1481-87; 2131-37; 3406-15;

---

[10] Amy Goddard instructed a Senior Special Inquiries Specialist to deny the benefits because the "denials would have followed suit. . ." *Id.* at 6220.

3819-25; 3947-56; 4119-24; 4575-83; 5059-64; 5413-18; 5828-32; 6377-83[11].  In fact, he used identical wording in 10 of those appeals.  He wrote:

> The requirements for documentation of the E&M codes were not met per AMA guidelines. Also the services are investigational. The services do need to have scientific literature permitting conclusions on net health outcome, have evidence that the intervenors improve net health outcome, and the interventions need to have evidence that they are as beneficial as established alternatives. . . .

AR:  401-09; 675-80; 938-43; 1264-70; 1481-87; 2409-13; 3406-15; 3819-25; 5059-64; 5413-18.  Dr. Barbara A. Muller upheld a denial for the same reasons.  *Id.* at 4841-4848.  The identical reasoning and conclusion for claims with unique facts and circumstances show that these decisions were merely a "rubber-stamp."

Similarly, Dr. Gutshall upheld denials for services rendered by Dr. Blackman for *nearly* the identical reasoning on 7 separate appeals.  *Id.* at 3-14; 185-198; 1626-38; 1786-98; 2801-15; 4304-16; 6140-42.  He essentially wrote in each denial,

> There is no clear osteopathic manipulative treatment (OMT) documented in the clinical records provided.  In addition, the notes lack any history of present illness, exam findings or assessment/plan to support the need for the evaluation and management (E&M) services. As such, the documentation does not support billing for either the OMT or the E&M codes for the dates of service.

Dr. Gutshall used the identical reasoning for denying benefits for Igenex Laboratory testing in two separate appeals.  *Id.* at 3-12; 1967-75.[12]

---

[11] The citations are to the "Clinical Appeal Worksheet" which encompasses Dr. Gutshall's review, decision and rationale.

[12] He concluded that the lab testing was not medically necessary and wrote "Long term Lyme disease is not an accepted clinical syndrome. Further testing to aid in its management is not supported by current medical opinion and current standards." AR: 3-12; 1967-75.

There was only one appeal in which Dr. Gutshall upheld the denial for a reason distinct from any other appeal: "The information submitted with your appeal does not provide documentation to support the elements for the level of service . . ." *Id.* at 6595-98.

A review of the record reveals that the denials by the medical director, and subsequently Dr. Gutshall of Medical Review Institute of America, Inc., were neither independent nor based on adequate evidence before them. In fact, the administrative record shows that Wellmark previously paid benefits for the same or similar services Wellmark is now denying. In addition, Wellmark was informed by the family's provider of the medically necessity of receiving the treatment. The 26 appeal denials were not based on substantial evidence. Therefore, Wellmark abused its discretion.

## B.    Wellmark's interpretation is not consistent with the goals of the Plan.

The goal of the Plan is to provide benefits for eligible medical procedures as defined in the Plan. *Davidson v. Wal-Mart Associates Health and Welfare Plan*, 305 F. Supp. 2d 1059, 1086 (S.D. Iowa 2004). Wellmark's interpretation would require this Court to deny benefits specifically defined as covered under the terms of the Plan.

## C.    Wellmark's interpretation renders language in the Plan meaningless or inconsistent, and is contrary to the plain language of the Plan.[13]

ERISA requires that administrators provide benefits to participants in accordance with the plain language of the plan. 29 U.S.C. § 1104(a)(1)(D). The most important factor in determining the reasonableness of an

---

[13] Plaintiffs have combined factors (2) and (5).

administrator's decision is the plan language.  *Davidson v. Wal-Mart Associates Health and Welfare Plan*, 305 F. Supp. 2d 1059, 1088 (S.D. Iowa 2004).  The Manual describes member's rights and responsibilities under the Plan.  The Manual requires that medical treatments must be "medically necessary."[14]  The Plan does not cover medical services that are considered "investigational or experimental."[15]  Both "Musculoskeletal Treatments" and

---

[14] A medically necessary health care service is one that a provider, exercising prudent clinical judgment, provides to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and is:

- Provided in accordance with generally accepted standards of medical practice. Generally accepted standards of medical practice as based on:
    - o Credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community;
    - o Physician Specialty Society recommendations and the view of physicians practicing in the relevant clinical area; and
    - o Any other relevant factors.
- Clinically appropriate in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease.
- Not provided primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeautic or diagnostic results as to the diagnosis or treatment of the illness, injury or disease.

[15] You are not covered for a service, supply, device, or drug that is investigational or experimental. A treatment is considered investigational or experimental when it has progressed to limited human application but has not achieved recognition as being proven effective in clinical medicine.

To determine investigational or experimental status, we may refer to the technical criteria established by the Blue Cross and Blue Shield Association, including whether a service, supply, device, or drug meets these criteria:

- It has final approval from the appropriate governmental regulatory bodies.
- The scientific evidence must permit conclusions concerning its effect on health outcomes.
- It improves the net health outcome.
- It is as beneficial as any established alternatives.
- The health improvement is attainable outside the investigational setting.

"Laboratory Services" are covered under the plain terms of the Plan. Wellmark's interpretation of the Plan would render "Laboratory Services" and "Musculoskeletal Treatments" meaningless.

### 1)   Laboratory Services

Laboratory services are a covered benefit under the Plan.  *Id.* at 2049, 2064.

> **X-ray and Laboratory Services**
> **Covered:** Tests, screenings, imaging, and evaluation procedures as
> identified in the American Medical Association's Current Procedural
> Terminology (CPT) manual, Standard Edition, under Radiology
> Guidelines and Pathology and Laboratory Guidelines.

*Id.* at 2064.  Wellmark's denial of benefits for laboratory services renders language in the Plan meaningless and inconsistent.

Gretchen and John received Igenex laboratory testing from Dr. Anderson.[16]  AR: 2, 1440.  John received Igenex laboratory testing on September 3, 2013.  *Id.* at 1440.  Gretchen received Igenex laboratory testing on July 25, 2013.  *Id.* at 2.  Dr. Jagiello, a medical director at Wellmark,

---

While we may rely on these criteria, the final decision remains at the discretion of our Medical Director, whose decision is not controlled by policies or decisions of other Blue Cross and Blue Shield member organizations. You may access our medical policies, with supporting information and selected medical references for a specific service, supply, device, or drug through our website, *Wellmark.com*.

[16] Benefits for Igenex Laboratory Services were previously paid by Wellmark. SAR: 1, 4, 7, 21. It wasn't until July 25, 2013 that Wellmark began to unreasonably deny benefits for Igenex Laboratory Services. *Id.* at 21.

Page **13** of **23**

denied benefits for both appeals on February 25, 2014 at 2:21 p.m.  *Id.* at 48, 2010.[17]

Benefits were denied for Gretchen and John for the reason that the laboratory testing was "investigational or experimental."  *Id.* at 42, 2029.  Dr. Jagiello's rationale, in whole, for both denials was:

> The United States Centers for Disease Control and Prevention (CDC) and the United States Food and Drug Administration (FDA) have cautioned clinicians that some commercial laboratories are performing assays for Lyme disease whose accuracy and clinical usefulness have not been adequately established [40].  These tests include urine antigen tests [41], immunofluorescent staining for cell wall-deficient forms of B. burgdorferi, lymphocyte transformation tests, and polymerase chain reaction (PCR) on inappropriate specimens such as blood and urine. (Source: UpToDate).

*Id.* at 48, 2010-11.

In both appeals, Dr. Anderson submitted a letter to Wellmark describing the medical necessity of the Igenex testing.  *Id.* at 15, 1978.  On appeal, Dr. Jim Gutshall upheld the denial and concluded that the lab testing was not medically necessary, despite Dr. Anderson's letter to the contrary.  *Id.* at 3-12, 1967-75. Dr. Gutshall claimed in both appeals, "Long term Lyme disease is not an accepted clinical syndrome.  Further testing to aid in its management is not supported by current medical opinion and current standards."  *Id.*  Despite previously paying for the same benefit and the letter from Dr. Anderson detailing the medical necessity of the Igenex testing, Wellmark denied services because the services were not medically necessary. *Id.* at 31-32, 1994-1996; SAR: 1, 4, 7, 21.

---

[17] Denying two separate, distinct appeals at the exact same minute cannot be considered anything short of "rubber-stamping."

M.A. had laboratory work done at Fry Industries on July 25, 2013.  AR: 3958-59.  Dr. Jagiello's rationale for denying benefits was, "[b]ased on review of laboratory services and provider's website, these tests would not be considered a standard of care in the evaluation of this child's symptoms."  *Id.* at 3972-73.  Gretchen appealed on behalf of M.A. and attached a letter from Dr. Gordon articulating M.A.'s health issues and the need for regular testing to help manage her pain and symptoms.  *Id.* at 3964-65.  On appeal, Dr. Gutshall concluded that the laboratory testing was investigational or experimental.  *Id.* at 3958-59.  Benefits were denied.  *Id.*

Wellmark's interpretation of the Plan would render the "Laboratory Services" section meaningless.  Benefits for Laboratory Services should have been paid under the plain terms of the Plan.

### 2)   Musculoskeletal Treatment is a covered benefit under the Plan.

Wellmark denied benefits for osteopathic manipulative treatments despite the plain language of the Manual.  Musculoskeletal treatment is a covered benefit under the Plan.  *Id.* at 2047, 2059.  Osteopathic manipulative treatment "involves using the hands to diagnose, treat, and prevent illness or injury."[18]  Osteopathic manipulative treatment involves moving a patient's muscles and joints to relieve pain, promote healing, and increase overall mobility.[19]

**Musculoskeletal Treatment**

**Covered:** Outpatient nonsurgical treatment of ailments related to the musculoskeletal system, such as manipulations or related procedures to treat musculoskeletal injury or disease.

*Id.* at 2059.

---

[18] https://www.osteopathic.org/OSTEOPATHIC-HEALTH/TREATMENT/Pages/default.aspx
[19] *Id.*

Gretchen, John, T.A. and M.A. regularly receive osteopathic manipulative treatments from Dr. Blackman to help relieve pain and inflammation caused by their conditions.  Wellmark paid for benefits for osteopathic manipulations from Dr. Blackman up until July 23, 2013.  SAR: 13, 14, 15, 16, 17, 18, 19, 20, 21.  Wellmark's denial of benefits is contrary to the plain terms of the Plan and not based on adequate, relevant evidence.

Gretchen received osteopathic manipulative treatments from Dr. Blackman between August 20, 2013 and December 11, 2013.  AR: 200.  Dr. Jagiello denied benefits for services for the following reasons: the "[r]ecords provided do not support EM level of service billed", "[r]ecords do not support number of body regions treated with OMT", and "ICD 9 codes submitted are not supported in the medical record".   *Id.* at 263.  T.A. received osteopathic manipulative treatments from Dr. Blackman on the following dates: July 23, 2013; August 27, 2013; September 30, 2013; October 8, 2013; October 29, 2013; November 12, 2013; December 2, 2013; and December 23, 2013.  *Id.* at 4413-14.  Coincidentally, Dr. Jagiello denied benefits for T.A. for the identical reasons provided above[20] just *one minute* after denying benefits to Gretchen. *Id.* at 263, 4438.[21]

Gretchen received osteopathic manipulative treatments between January 19, 2015 – February 10, 2015; April 14 – September 30.  *Id.* at 1604, 6140.  Dr. Jagiello denied benefits for treatments on January 19, 2015; January 27, 2015; and May 4, 2015 because the information submitted did not support the level of billing charged, yet Wellmark did not request any

---

[20] Dr. Jagiello denied benefits for services for the following reasons: the "[r]ecords provided do not support EM level of service billed", "[r]ecords do not support number of body regions treated with OMT", and "ICD 9 codes submitted are not supported in the medical record." AR: 4438.
[21] Denying two separate, distinct benefits within a minute cannot be considered anything short of "rubber-stamping."

additional information from Gretchen or the provider.  *Id.* at 1627, 1666-67. There was no initial determination for denying benefits on February 10, but the benefits were denied.  *Id.* at 1666-67. Dr. Jagiello recommended denying benefits for treatment on April 14, 2015 because the "Records are sketchy and minimal."  *Id.* at 6225.  Despite *no* review of services rendered on May 12, 2015; May 19, 2015; and May 25, 2015, Amy Goddard instructed a Senior Special Inquiries Specialist to deny the benefits because the "denials would have followed suit."  *Id.* at 6220.  Not only was Wellmark's interpretation contrary to the plain language of the Plan, Wellmark made denial decisions without even reviewing the evidence before it.

John received osteopathic manipulative treatments on July 23, August 28 and September 9 of 2013; March 19, March 24 and December 9 of 2014. AR: 1814-15, 2784.  M.A. received osteopathic manipulative treatments on July 23, 2013; September 2, 2013; September 11, 2013, September 26, 2013; October 9, 2013; and, January 20, 2014.  *Id.* at 3244-45.  T.A. received osteopathic manipulative treatments on July 23, 2013; August 27, 2013; September 30, 2013; October 8, 2013; October 29, 2013; November 12, 2013; December 2, 2013; and December 23, 2013. *Id.* at 4413-14. All of these denials were based on Dr. Gutshall's "copy and paste" denial method.[22]

Services for osteopathic manipulative treatments should have been covered under "Musculoskeletal Services" as defined in the Manual. Wellmark's interpretation is contrary to the plain terms of the Plan, and renders the "Musculoskeletal Services" section meaningless.

---

[22] AR: 3-14; 185-198; 1626-38; 1786-98; 2801-15; 4304-16; 6140-42.

**D.      Wellmark's interpretation conflicts with the substantive or procedural requirements of the ERISA statute**

"ERISA requires employee benefit plans to 'provide adequate notice' to any participant or beneficiary whose claim is denied 'setting forth specific reasons for such denial' in a manner calculated to be understood by the participant." *King v. Hartford Life and Acc. Ins. Co.,* 414 F.3d 994, 999–1000 (8th Cir. 2005) *quoting* 29 U.S.C. § 1133.  The applicable federal regulations elaborate that notice of denial under Section 1133 must provide:

1. The specific reason or reasons for the adverse determination;

2. Reference to the specific plan provisions on which the determination is based;

3. A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

4. A description of the plan's review procedures and the time limits applicable to such procedures. . .

29 C.F.R. § 2560.503–1(g).

The Eighth Circuit has held that the basis for the denial must "briefly state the facts of the case and the rationale for [the] decision. *Id. citing Brumm v. Bert Bell NFL Retirement Plan*, 995 F.2d 1433, 1436 (8th Cir. 1993).  "Bald-faced" conclusions do not satisfy the requirement. *Brumm*, 995 F.2d at 1436.  In other words, "an administrator with discretion under a benefit plan must articulate its reasons for denying benefits when it notifies the participant or beneficiary of an adverse decision, and the decision must be supported by both a reasonable interpretation of the plan and substantial evidence in the materials considered by the administrator." *King,* F.3d at 999-1000.

Essentially every final determination letter was based on the following conclusion: the services were not medically necessary or are considered "experimental or investigational." AR: 31-32; 229-30; 411-12; 633-34; 798-00; 1191-93; 1440-42; 1604-05;  1814-15; 1994-96; 2139-40; 2328-29; 2597-99; 3244-45; 3417-18; 3654-56; 3958-59; 4126-27; 4413-14; 4796-97; 4995-97; 5322; 5493-94; 5803-05; 6140-42; 6575-77.  There was no factual discussion on each denial, nor an independent rationale for each denial.  The "Clinical Appeal Worksheet" was simply a cut and paste of the medical director's initial determination and a rubber-stamped rationale from an "independent" physician.  *Id.* at 3-12; 185-198; 401-09; 675-80; 938-943; 1264-70; 1481-87; 1626-38; 1786-98; 1967-75; 2131-37; 2409-13; 2801-15;[23] 3406-15; 3819-25; 3947-56; 4119-24; 4304-16; 4575-83; 5059-64; 5413-18; 5828-32; 6171-836; 6377-83; 6595-98.   A review of the record reveals that the denials by the medical director, and subsequently Dr. Gutshall of Medical Review Institute of America, Inc., did not comply with 29 U.S.C. § 1133.  Therefore, Wellmark abused its discretion.

## E.      Wellmark has not interpreted the relevant terms of the Plan consistently.

Most concerning is Wellmark's lack of consistently interpreting the terms of the Plan. As the Supplemental Administrative Record ("SAR") provides, Wellmark regularly paid benefits for the same services it is now unreasonably denying.  *See* SAR: 1-42. Igenex Laboratory Services were previously paid by Wellmark. SAR: 1, 4, 7, 21.  It wasn't until July 25, 2013 that Wellmark began to unreasonably deny benefits for Igenex Laboratory Services.  *Id.* at 21. Wellmark regularly paid for osteopathic manipulative

---

[23] The "Clinical Appeal Worksheet" is missing from the amended Administrative Record for Appeal 60863. AR: 3243-3403.

treatments from Dr. Blackman. *Id.* at 13, 14, 15, 16, 17, 18, 19, 20, 21. It wasn't until July 23, 2013 that Wellmark began to unreasonably deny benefits for osteopathic manipulative treatments from Dr. Blackman. *Id.* at 21. Although Wellmark denied benefits for services at Gordon Medical Associates (Dr. Anderson and Dr. Gordon), Wellmark often times paid benefits. *Id.* at 1, 2, 3, 4, 7, 12, 17, 18, 19, 20, 22. On October 1, 2013, Wellmark began to more frequently deny benefits to Gordon Medical Associates. *Id.* at 23-42. Wellmark regularly paid for services to Whole Child Wellness/ Whole Family Wellness until March 10, 2014. *Id.* at 22, 23, 25. On January 29, 2014, Wellmark began to deny services to Whole Child Family Wellness. *Id.* at 26 – 42.

The Administrative Record and the Supplemental Administrative Record establish that Wellmark has unreasonably denied benefits to Gretchen and her family. Wellmark has not relied on the Plan, nor on relevant, adequate evidence. Instead, the record shows that on or about July 23, 2013, Wellmark began denying benefits without any reasonable explanation. As a result, Gretchen and her family have been forced to appeal 26 denial decisions for services previously paid for by Wellmark. These appeals required substantial efforts by Gretchen to obtain information requested by Wellmark with very little guidance from Wellmark on what information is needed. Not only are Wellmark's denials unreasonable, the record establishes that Wellmark has acted arbitrarily and in bad faith.

### 3.     Plaintiffs are entitled to attorneys fees.

Attorney's fees are available under ERISA pursuant to 29 U.S.C. § 1132(g)(1). "In any action under this subchapter ..., the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29

U.S.C. § 1132(g)(1).  In exercising that discretion, the court should consider the following:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of attorneys' fees; (3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions.

*Lawrence v. Westerhaus*, 749 F.2d 494, 496 (8th Cir. 1984).

On or about July 23, 2013, Wellmark began denying benefits for Gretchen and her family.  Gretchen had to hire an attorney and file 26 appeals on behalf of herself and her family in hopes that Wellmark would continue paying benefits she and her family were entitled to under the terms of the Plan.  As described above, Wellmark simply rubber-stamped the denials, without any consideration of the relevant evidence before them. Wellmark acted unreasonably, and in bad faith.  There is no question that Wellmark has the ability to pay attorneys fees.  Awarding attorney's fees in this case would deter Wellmark from denying benefits without reviewing the information before it, or simply cutting and pasting denials without reviewing the file/medical records before it.  For these reasons, Plaintiffs would respectfully ask for an award of attorney's fees to offset the expenses Plaintiffs incurred to dispute benefits they were rightfully entitled to under the terms of the Plan.

## Conclusion

The record shows that Wellmark's denials were not based on relevant, adequate evidence, but merely upon copy-and-paste rationales.  Neither the original medical director, nor the independent physician relied on competent evidence.  Each provider submitted a statement detailing the medical necessity of the treatment at issue yet Wellmark regularly concluded that the services were not "medically necessary." Wellmark should have relied on the plain terms of the Plan and the substantive and procedural requirements of ERISA. Wellmark's denials were unreasonable, and an abuse of discretion.

For these reasons, Plaintiffs respectfully ask the Court for an order to recover benefits due under the terms of the Plan, and to clarify that the services rendered by the providers at issue are covered services under the terms of the Plan.

Dated this 30th day of September, 2016.

BANGS, McCULLEN, BUTLER,
FOYE & SIMMONS, L.L.P


By: */s/ Terry G. Westergaard*
    Terry G. Westergaard
      twestergaard@bangsmccullen.com
    Daniel F. Duffy
      dduffy@bangsmccullen.com
    Kelsey B. Parker
      kparker@bangsmccullen.com
    PO Box 2670
    Rapid City, SD 57709
    (605) 343-1040

    *ATTORNEYS FOR PLAINTIFFS*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on September 30, 2016, he caused true and correct copies of the above to be served upon each of the persons identified below as follows:

| | | | |
|---|---|---|---|
| [ ] | First Class Mail | [ ] | Overnight Mail |
| [ ] | Hand Delivery | [ ] | Facsimile |
| [ ] | Electronic Mail | [X] | E-filing |

Barbara Anderson Lewis
Lynn Jackson, Schultz,
& LeBrun, P.C.
P.O. Box 8250
Rapid City, SD  57709-8250
blewis@lynnjackson.com

*Attorney for Defendants*

Ryan G. Koopmans
Nyemaster Goode, P.C.
700 Walnut Street, Suite 1600
Des Moines, IA  50309
rkoopmans@nyemaster.com

*Attorney for Defendants*

*/s/ Terry G. Westergaard*
TERRY G. WESTERGAARD