UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| GRETCHEN HILLENBRAND and JOHN ARLT, Individually and on behalf of M.A. and T.A. as natural guardians, | 5:16-CV-05007-KES |
| Plaintiffs, | ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| WELLMARK OF SOUTH DAKOTA, INC., | |
| Defendant. | |

Plaintiffs filed suit under 29 U.S.C. § 1132(a)(1)(B) claiming that defendant, Wellmark of South Dakota, Inc., wrongfully denied benefits and improperly handled claims under a group health plan operated by Wellmark and governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461 (2012). Docket 33. Currently pending are cross-motions for summary judgment. Dockets 42 and 50. For the reasons that follow, the court denies plaintiffs' motion for summary judgment and grants Wellmark's motion for summary judgment.

**FACTUAL BACKGROUND**[1]

Plaintiff Gretchen Hillenbrand is an enrolled member of a Blue Select, BlueRX Preferred Plan ("the Plan") operated by Wellmark. Docket 51 ¶ 1.

---

[1] The court draws facts from the Administrative Record ("AR"), the Supplement to the Administrative Record ("SAR"), Docket 47, and the portions of the statements of undisputed material facts that are either not disputed or not subject to genuine dispute.

Plaintiffs John Arlt, M.A., and T.A. are also covered under the Plan. *Id.* ¶ 2. Coverage for the Plan is provided to plaintiffs by the employer group Dakota Partnership DBA Triple Seven Ranch. *Id.* ¶ 4.

Plaintiffs have a number of health conditions and diagnoses that require treatment. Gretchen suffers from Lyme disease and three different autoimmune diseases: hypothyroidism, ulcerative colitis, and polychondritis. *Id.* ¶¶ 7-8. John suffers from Lyme disease and reactive arthritis. *Id.* ¶ 9. John has also been diagnosed with Reiter's Syndrome. AR at 2365-2367. Both M.A. and T.A. have been diagnosed with Lyme disease. Docket 51 ¶ 10.

To treat the plaintiffs' health conditions and diagnoses, plaintiffs obtain treatment from various providers.[2] *See* SAR at 1-42. One of these providers is Dr. Elliott Blackman, who provides plaintiffs with osteopathic manipulative treatments.[3] Docket 51 ¶ 11. Another of plaintiffs' providers is Dr. Suruchi Chandra from Whole Family Wellness/Whole Child Wellness. *Id.* ¶ 12. Plaintiffs are also treated by Dr. Wayne Anderson, a licensed naturopathic physician,[4] and Dr. Eric Gordon of Gordon Medical Associates. *Id.* ¶ 13. In the course of

---

[2] Only the providers relevant to the pending motions for summary judgment are discussed here.

[3] Osteopathic medicine is "[a] school of medicine based on a concept of the normal body as a vital machine capable, when in correct adjustment, of making its own remedies against infections and other toxic conditions; practitioners use the diagnostic and therapeutic measures of conventional medicine in addition to manipulative measures." *Osteopathic Medicine*, *Stedman's Medical Dictionary* 638330 (28th ed. 2006).

[4] Naturopathy is a system of therapeutics that places reliance on natural or nonmedical forces and where surgical and medicinal agents are not used. *Naturopathy*, *Stedman's Medical Dictionary* 588600 (28th ed. 2006).

their treatment of plaintiffs, Drs. Anderson and Gordon occasionally ordered that lab tests be conducted and use Ingex, Inc. to process the lab tests. SAR at 1, 4, 7, 21, 22, 23.

The benefits covered under the Plan are listed in the Blue Select, BlueRx Preferred Coverage Manual ("Coverage Manual").[5] AR at 89-181 (copy of Coverage Manual). The Coverage Manual also lists all of the possible restrictions on coverage under the Plan. *See id.* One such restriction is that all treatments must be medically necessary in order for a claim to be awarded. AR at 123 ("A key general condition in order for you to receive benefits is that the service, supply, device, or drug must be medically necessary."). As explained in the Coverage Manual,

> A medically necessary health care service is one that a provider, exercising prudent clinical judgment, provides to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and is:
>
> - Provided in accordance with generally accepted standards of medical practice. Generally accepted standards of medical practice are based on:
>
>   - Credible scientific evidence published in peer-reviewed medical literature generally recognized by the relevant medical community;
>
>   - Physician Specialty Society recommendations and the views of physicians practicing in the relevant clinical area; and
>
>   - Any other relevant factors.

_____

[5] The Coverage Manual, which is reproduced in multiple portions of the administrative record, is also commonly referred to as the "Benefits Certificate." *See, e.g.*, AR 669 (explanation of benefits form directing plaintiffs to refer to the "Benefits Certificate" for additional information).

- Clinically appropriate in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease.

- Not provided primarily for the convenience of the patient, physician, or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the illness, injury or disease.

An alternative service, supply, device, or drug may meet the criteria of medical necessity for a specific condition. If alternatives are substantially equal in clinical effectiveness and use similar therapeutic agents or regimens, [Wellmark] reserve[s] the right to approve the least costly alternative.

*Id.* It is within Wellmark's discretion to determine if a service is medically necessary. *Id.* If Wellmark concludes that a service is not medically necessary, the plan member is responsible for the cost of the service. *Id.*

Another restriction detailed in the Coverage Manual is that Wellmark may deny benefits if Wellmark determines that the medical service or treatment is investigational or experimental. AR at 124. "A treatment is considered investigational or experimental when it has progressed to limited human application but has not achieved recognition as being proven effective in clinical medicine." *Id.* If Wellmark determines that a service or treatment is experimental or investigational, the plan member is responsible for the costs of the service. *Id.*

To determine whether a claim is medically necessary, investigational or experimental, or not coverable for some other reason, *see* AR at 123-26 (general conditions of coverage, limitations, and exclusions) Wellmark often

must review medical documentation. For plan members who use participating providers,[6] all medical documents relevant to the plan member's claims are submitted directly to Wellmark by the provider. AR at 155. But, when plan members use nonparticipating providers,[7] the plan member is responsible for filing a claim to seek reimbursement from Wellmark. AR at 140-41; *see also* AR at 155-157 (describing the claims process). After a claim is submitted—regardless of whether the provider or the plan member submits the claim—the plan member receives an explanation of benefits form that details the amount the provider charged for the medical service, how Wellmark applied benefits to the claim, what amount of the claim Wellmark will pay, and what amount of the claim the plan member must pay. AR at 156. If a submitted claim is rejected in whole or in part, a plan member can initiate an internal appeal of the determination on that claim. AR at 157.

Under the Coverage Manual, after receiving notification of an adverse benefit decision, a plan member or their authorized representative has 180 days to initiate an internal appeal. AR at 165. When requesting an internal appeal, a claimant "must submit all relevant information . . . including the reason for your appeal. This includes written comments, documents, or other information in support of your appeal." *Id.* Wellmark's review of the internal appeal considers "all information regarding the adverse benefit determination

---

[6] A participating provider, also known as a "PPO Provider," is any "facility or provider that participates with a Blue Cross or Blue Shield preferred provider program." AR at 176.

[7] A nonparticipating provider is a "facility or practitioner that does not participate with a Blue Cross or Blue Shield Plan." AR at 176.

whether or not the information was presented or available at the initial determination." AR at 166. The Coverage Manual also provides that the internal review will not involve any Wellmark employees who participated in the initial benefit determination, and that the review "will be conducted without regard to the original decision." *Id.* In the event that the decision on an internal appeal requires a medical judgment, Wellmark may consult a qualified medical expert who was not involved in the initial determination and who does not have a conflict of interest, to render an opinion. *Id.* Once Wellmark makes a decision on an internal appeal, the decision is final. *Id.* Claimants generally receive notice of Wellmark's final decision on an appeal within 30 days, and all appeal requests are determined within 60 days after the appeal is filed. *Id.*

Between July 2011 and July 2013, Wellmark processed a number of claims submitted by plaintiffs from various providers. SAR at 1-21. While some of these claims were denied, the majority of the benefits claims submitted by plaintiffs were approved. *See id.* After July 23, 2013, however, Wellmark began to more regularly deny claims from plaintiffs' providers (Drs. Blackman, Chandra, Anderson, and Gordon) and from Ingex.[8] *Id.* at 21-42. As a result of Wellmark's initial claim denials, plaintiffs filed a total of 26 internal appeals between July 23, 2013, and September 24, 2015. *See* Docket 51 ¶¶ 14-262 (summary of the 26 appeals). All 26 of the internal appeals filed by plaintiffs were denied by Wellmark for one or more of the following three reasons:

---

[8] As documented in the Supplement to the Administrative Record, while most claims from these providers were denied, not every claim from these providers was denied. *E.g.,* SAR at 22-23, 33-35.

(1) Wellmark found that the submitted claim was not medically necessary, *e.g.,* AR at 31-32, (2) Wellmark determined that the treatment provided was experimental or investigational, *e.g.,* AR at 1191-92, or (3) Wellmark concluded that there was insufficient information submitted to allow Wellmark to approve the claim. *E.g.,* AR at 2597-98.

## STANDARD OF REVIEW

Courts review a plan administrator's benefit determinations for an abuse of discretion if an ERISA governed plan grants the plan administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the parties agree that the Plan's language requires the court to apply the abuse of discretion standard in reviewing Wellmark's denial of plaintiffs' benefits.[9] Docket 43 at 5-6; Docket 52 at 2. "This highly deferential standard reflects the fact that courts are hesitant to interfere with the administration of [an ERISA] plan." *Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 952 (8th Cir. 2010) (quotation and citation omitted) (alteration in original). Courts review only a plan administrator's "final claims determination, [and] not the initial denial letter, to ensure development of a complete record." *Ingram v. Terminal R.R. Ass'n of St. Louis Pension Plan for Nonschedule Emps.*, 812 F.3d 628, 634 (8th Cir. 2016) (citing *Khoury*, 615 F.3d at 952).

---

[9] The Coverage Manual provides: "We [(Wellmark)] have the administrative discretion to determine whether you [(the plan member)] meet our written eligibility requirements, or to interpret any other term in this coverage manual." AR at 169.

Under the abuse of discretion standard of review, a plan administrator's benefit determination must stand if the decision "is based on a reasonable interpretation of the Plan and is supported by substantial evidence." *Hampton v. Reliance Standard Life Ins. Co.*, 769 F.3d 597, 600 (8th Cir. 2014). Substantial evidence is defined as "more than a scintilla but less than a preponderance." *Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 583 (8th Cir. 2008). "A decision is reasonable 'if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision.' " *Ingram*, 812 F.3d at 634 (quoting *Midgett v. Wash. Grp. Int'l Long Term Disability Plan*, 561 F.3d 887, 897 (8th Cir. 2009)). In *Finley v. Special Agents Mut. Benefits Ass'n, Inc.*, 957 F.2d 617 (8th Cir. 1992), the Eighth Circuit identified several factors to guide courts when determining whether a plan administrator's interpretations of an ERISA-governed plan was reasonable, including

> whether their interpretation is consistent with the goals of the Plan, whether their interpretation renders any language of the Plan meaningless or internally inconsistent, whether their interpretation conflicts with the substantive or procedural requirements of the ERISA statute, whether they have interpreted the words at issue consistently, and whether their interpretation is contrary to the clear language of the Plan.

*Finley*, 957 F.2d at 621. Although these factors inform a court's review of a plan administrator's decision, "[w]here a plan fiduciary offered a reasonable interpretation of a disputed plan provision, 'courts may not replace it with an interpretation of their own—and therefore cannot disturb as an "abuse of discretion" the challenged benefits determination.' " *Ingram*, 812 F.3d at 634

(quoting *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 999 (8th Cir. 2005) (en banc)).

A plan administrator has a conflict of interest when the administrator holds the dual role of making benefit determinations and paying benefit claims. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).[10] Where a conflict of interest exists, courts apply the abuse of discretion standard but take the conflict into account "as a factor in determining whether the plan administrator has abused its discretion in denying benefits." *Id.* The significance of the factor depends upon the circumstances of the particular case. *Id.* "When an insurer has a history of biased claims administration, the conflict may be given substantial weight. When an insurer has taken steps to reduce the risk that the conflict will affect eligibility determinations, the conflict should be given much less weight." *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1038 (8th Cir. 2010) (internal marks omitted) (citing *Glenn*, 554 U.S. at 108).

## DISCUSSION

Plaintiffs seek an order finding that Wellmark abused its discretion by unreasonably denying benefits owed to plaintiffs under terms of the Plan. Docket 43 at 22. Plaintiffs present two primary arguments in support of their claim that Wellmark abused its discretion when it denied plaintiffs' 26 benefit claims. *See id.* at 6-20; Docket 53 at 4-13. The court will address each of these arguments in turn.

---

[10] The parties do not dispute that under the Plan, Wellmark was responsible both for making benefit determinations and paying benefit claims. *See* AR at 124-26.

## I. Whether Wellmark's Denials of Plaintiffs' Claims was Supported by Substantial Evidence?

Plaintiffs argue that Wellmark lacked substantial evidence to deny plaintiffs' 26 internal appeals because Wellmark's initial denials, as well as Wellmark's "rubber stamp" affirmances of those initial denials during the internal appeals process, were not supported by substantial evidence. Docket 43 at 7-11. Plaintiffs' theory in support of this argument is that Wellmark's medical directors often denied plaintiffs' benefit claims in the first instance without reviewing the plaintiffs' medical records. *See id.* at 8-9 (discussing some of Wellmark's initial claims denials). Moreover, according to plaintiffs, within minutes of making an initial benefit determination in one claim, Wellmark's medical directors would often deny benefits in a completely different claim and use identical reasoning to support the denials. *See id* at 8 (citing AR at 263, 3265, 4438) (arguing that the denial of these claims, which occurred within minutes of one another and were denied for identical reasons, demonstrates that Wellmark's medical directors did not rely on substantial evidence in denying the claims). These errors were compounded during the internal appeals process, when—despite the fact that plaintiffs submitted letters from their providers that described the medical necessity of the treatment—Wellmark would deny plaintiffs' appeals for the same reasons that Wellmark denied the initial benefits request. *See id.* at 9-11 (comparing some of Wellmark's justifications for denying plaintiffs' initial benefits claims and observing that Wellmark often denied the appeals for those benefit claims using language that was identical to the initial claim denial).

10

Wellmark responds by arguing that the initial decision by Wellmark's medical directors is beyond the court's review. Docket 52 at 7. This is because "under ERISA, [courts] 'review only the final claims decision, and not the initial, often succinct denial letters, in order to ensure the development of a complete record.' " Docket 52 at 7 (quoting *Khoury*, 615 F.3d at 952). Wellmark further contends that even if this court were to consider the reasons behind the initial claims denials, the court would find that Wellmark relied upon substantial evidence in denying each of plaintiffs' 26 claims. *See id.* at 7-8 (stating that it was reasonable for Wellmark's medical directors to respond to many of plaintiffs' claims together because the claims themselves were often identical). Finally, Wellmark disputes plaintiffs' allegation that Wellmark's final decisions were just a "rubber stamp" approval of the initial decisions by Wellmark's medical directors. *Id.* at 8-9. According to Wellmark, the reason Wellmark's final claim determinations were similar or identical to the initial claims determinations was because plaintiffs "kept submitting the same deficient claims and . . . the same letters in support of those claims, . . . Wellmark kept [giving] them the same answer." *Id.* at 9.

The court finds that Wellmark relied upon substantial evidence in denying plaintiffs' 26 internal appeals. As the Administrative Record makes clear, many of the claims that plaintiffs cite as evidence that Wellmark engaged in a systematic effort to give only cursory reviews to plaintiffs' claims actually belie the plaintiffs' arguments. For example, plaintiffs cite pages 48 and 2010 of the Administrative Record as evidence that Wellmark's initial medical

directors, "[d]espite allegedly reviewing the file, . . . would deny benefits for two separate claims (two separate individuals) at the exact same time and for the identical reason." Docket 43 at 8 (citing AR at 48, 2010). But because these two claims—for Gretchen Hillenbrand (AR at 48) and John Arlt (AR at 2010)—were both submitted by plaintiffs on May 28, 2014, and received by Wellmark on May 30, 2014, *see* AR at 42, 1977, it is reasonable that Wellmark would review the claims together.[11] Also the fact that the claims were initially reviewed and denied together does not mean that Wellmark's final determination for each claim was not based upon substantial evidence.[12] *Compare* AR at 31-32 (final determination letter for Gretchen's claim), *with* AR at 1994-95 (final determination letter for John's claim).

Eighth Circuit precedent requires that courts review only a plan administrator's "final claims determination, [and] not the initial denial letter, to ensure development of a complete record." *Ingram*, 812 F.3d at 634 (citing *Khoury*, 615 F.3d at 952). Because the Plan here grants Wellmark discretion to

---

[11] It is also worth noting that the emails cited by plaintiffs, *see* Docket 43 at 8 (citing AR at 48 and AR at 2010), are the exact same email, which would also explain why the claims were decided at the same time and for the same reason.

[12] This same situation, where Wellmark's medical directors would make an initial determination to deny different claims—that were submitted to Wellmark on the same date—within minutes of one another, occurs in multiple places in the Administrative Record. *Compare* AR at 263 (initial determination on claims for Gretchen) *with* AR at 3265 (initial determination on claims for M.A.), *with* AR at 4438 (initial determination on claims for T.A.). In each case, however, it is clear that Wellmark relied on substantial evidence when making its final determination on each of the claims. *See* AR at 229 (final determination on claims for Gretchen); AR at 3244 (final determination on claims for M.A.); AR at 4413 (initial determination on claims for T.A.).

construe the Plan's language, the court can only overturn Wellmark's denials if they were unsupported by substantial evidence, that is "more than a scintilla but less than a preponderance." *Wakkinen*, 531 F.3d at 583. Plus, "[w]hen a plan places the burden on the claimant to provide necessary information, the claimant cannot shift the burden of investigation to the plan administrator." *Sahulka v. Lucent Techs, Inc.*, 206 F.3d 763 (8th Cir. 2000). Here the Plan put the burden on plaintiffs to produce "*all relevant information* with your appeal, including the reason for your appeal." AR at 165 (emphasis added). Thus, the fact that plaintiffs and their treating physicians believed certain treatments were medically necessary does not require that Wellmark reach the same conclusion. *See* AR at 123 ("Unless otherwise required by law, Wellmark determines whether a service . . . is medically necessary.").

In denying plaintiffs' claims, Wellmark reviewed all of the records provided by plaintiffs. *See, e.g.*, AR at 31, 1994 ("The information you have submitted has been reviewed."). Given that the abuse of discretion standard applied in ERISA cases is meant to be "highly deferential," *Khoury*, 615 F.3d at 952, the court finds that Wellmark's decisions were supported by substantial evidence. Thus, Wellmark did not abuse its discretion in denying plaintiffs' 26 internal appeals seeking an award of benefits.

**II.    Whether Wellmark's Denials of Plaintiffs' Claims was Reasonable?**

Citing the Eighth Circuit's *Finley* factors, plaintiffs argue that Wellmark's denial of the 26 internal appeals was unreasonable and constitutes an abuse of discretion. Docket 43 at 11-20; Docket 53 at 8-13. Plaintiffs specifically

contend that Wellmark's lack of consistency when interpreting the Plan's terms and when deciding to award or deny benefits demonstrates that Wellmark's review during the internal appeals process was unreasonable. Docket 43 at 19-20 (citing SAR at 1-42) (arguing that plaintiffs' claims for benefits did not begin to become denied with regularity until after July 23, 2013); Docket 53 at 12-13 (citing SAR at 1-42) (same). Plaintiffs also identify Wellmark's alleged failure to honor the Plan's language when deciding to award or deny benefits claims as further evidence of the unreasonableness of Wellmark's internal review process. Docket 43 at 11-17; Docket 53 at 9-10.

Wellmark, on the other hand, argues that the denials of plaintiffs' various claims were reasonable. Docket 52 at 8-11. To support this argument, Wellmark cites to portions of the Administrative Record and the Coverage Manual to highlight that many of the plaintiffs' claims were denied because the treatments provided were not medically necessary or were investigational or experimental. *See id.* Wellmark further maintains that the fact that all of the plaintiffs' benefits claims were subject to a review as to whether the treatments are medically necessary, experimental, or investigational underscores the reasonableness of Wellmark's final determinations on plaintiffs' internal appeals. *Id.* at 9-11.

Because the Plan gives Wellmark the discretion to interpret the Plan's language, this court cannot replace Wellmark's interpretations of the language of the plan with its own interpretations. *Ingram*, 812 F.3d at 634. Thus, while the *Finley* factors are meant to guide this court's analysis when assessing the

reasonableness of Wellmark's interpretations of the Plan language, the ultimate inquiry is whether Wellmark's decisions were reasonable. As explained in more detail below, after considering the *Finley* factors, *Finley*, 957 F.2d at 621, and analyzing Wellmark's interpretations of the relevant Plan terms, the court believes that all of the *Finley* factors weigh in Wellmark's favor. Therefore, the court concludes that Wellmark's final determinations on plaintiffs' 26 internal appeals were reasonable.

First, Wellmark's interpretations of the Plan language (i.e. the Coverage Manual) were consistent with the goals of the Plan. *See id.* According to plaintiffs, the goal of the Plan is to "provide benefits for eligible medical services." Docket 43 at 11. But nothing in the Plan, the Administrative Records, or the parties' briefs suggests that Wellmark's interpretations of the Coverage Manual negated the goals of the Plan. Thus, this factor weighs in Wellmark's favor.

Second, Wellmark's interpretations did not render any of the Plan's language meaningless, were not internally inconsistent, and were not contrary to the Plan's clear language. *See Finley*, 957 F.2d at 621.[13] Plaintiffs cite to the Coverage Manual's language stating that both "laboratory services" and "musculoskeletal treatment" are covered services as evidence that Wellmark's denials of plaintiffs' appeals made the Plan's language meaningless, were internally inconsistent with the Plan's language, and were contrary to the clear

---

[13] Because plaintiffs' analysis of the *Finley* factors combined factors two and five, Docket 43 at 11 n. 11, the court also considers those factors together.

language of the Plan. Docket 43 at 12-17 (citing AR at 2059, 2064). But, as is clear from a reading of the Coverage Manual as a whole, even though certain treatments are listed as generally covered does not mean that the treatments will always be covered. *See, e.g.*, AR at 123 (stating that even a service that is normally covered "may be excluded if it is not medically necessary in the circumstances"); AR at 124 (stating that "investigational or experimental" services are not covered under the Plan). And by giving force to these provisions of the Plan, Wellmark's denials of plaintiffs' internal appeals were not contrary to the Plan's language nor did the denials make the Plan's language internally inconsistent or meaningless. *See Manning*, 604 F.3d at 1042 (concluding that a plan administrator's decision to enforce a plan provisions requiring a plan member to present objective medical evidence of a disability was not inconsistent with the language of the plan and did not "render any language in the plan meaningless or internally inconsistent"). Therefore, these *Finley* factors also weigh in Wellmark's favor.

Third, Wellmark's interpretations of the Plan's language did not conflict with the procedural or substantive requirements of ERISA. *See Finley*, 957 F.2d at 621. Under ERISA, when a plan administrator gives an adverse benefit determination, it must provide a notice to the plan member stating "the specific reasons for such denial, written in a manner calculated to be understood by the participant. . . ." 29 U.S.C. § 1133(1); *King*, 414 F.3d at 999 (citing 29 U.S.C. § 1133). "The purpose of this requirement is to provide claimants with enough information to prepare adequately for further administrative

review or an appeal to the federal courts." *DuMond v. Centex Corp.*, 172 F.3d 618, 622 (8th Cir. 1999). The substance of a notice under § 1133 is defined by 29 C.F.R. § 2560.5031-1(g), the applicable federal regulation for the content required in adverse benefit determinations. Under 29 C.F.R. § 2560.5031-1(g), a notification of an adverse benefit determination must include, "in a manner calculated to be understood by the claimant—"

> (i) The specific reason or reasons for the adverse determination;
>
> (ii) Reference to the specific plan provisions on which the determination is based;
>
> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; [and]
>
> (iv) A description of the plan's review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review[.]

*Id.*; *Chorosevic v. MetLife Choices*, 600 F.3d 934, 943 n.9 (8th Cir. 2010).

Plaintiffs argue that under Wellmark's denial letters, it was "difficult to ascertain just what Wellmark needed from Plaintiffs to reverse the decision of the medical director." Docket 53 at 12. As such, according to plaintiffs, the denial letters failed to comport with the requirements of 29 U.S.C. § 1133(1) and 29 C.F.R. § 2560.5031-1(g).[14] *Id.* at 10-12. An examination of the final determination letters that were sent to plaintiffs, however, demonstrates that Wellmark's denial letters complied with the requirements of 29 U.S.C. § 1133 and 29 C.F.R. § 2560.5031-1(g). *E.g.,* AR at 5803-05 (denial letter informing

---

[14] Plaintiffs do not argue that Wellmark failed to provide a reasonable opportunity for a full and fair review of their claims under 29 U.S.C. § 1133(2).

plaintiffs that the treatment provided was "not medically necessary," listing the section and language of the Coverage Manual that defines "medically necessary health care services," citing the applicable regulations relied on to determine that the claim was insufficient as submitted, and informing plaintiffs of their right to file a civil action under section 502(a)).

Furthermore, plaintiffs have not shown that the information Wellmark provided in the final determination letters was so insufficient that the notice failed to provide plaintiffs with an understanding of Wellmark's decision. *See Chorosevic*, 600 F.3d at 944 (concluding that plaintiffs made no showing that required the plan administrator to "describe the additional materials or information needed for further review" under the applicable ERISA regulations). Under ERISA, a plan administrator is required to "identify and request additional information only if [the plan administrator] 'believe[d] that more information [was] needed to make a reasoned decision.' " *Id.* (quoting *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997)) (last two alterations in original). Therefore, because Wellmark did not believe that more information was needed to reach a final decision on plaintiffs' internal appeals, Wellmark was not required to request that information. Thus, Wellmark's decisions on plaintiffs' internal appeals did not conflict with the procedural or substantive requirements of ERISA and this factor weighs in Wellmark's favor.

Finally, nothing in the Administrative Records shows that Wellmark failed to interpret the words at issue in the Coverage Manual consistently. *See Finley*, 957 F.2d at 621. Plaintiffs argue that Wellmark took inconsistent

positions by initially granting plaintiffs' benefits claims for services from their providers and then denying similar claims from those same providers after July 23, 2013.[15] Docket 43 at 19-20 (citing SAR at 1-42); Docket 53 at 12-13 (citing SAR at 1-42). According to plaintiffs, "it is Wellmark's inconsistent application of the Plan terms that shows the unreasonableness of its decision to pay or deny benefits." Docket 53 at 13. While plaintiffs are correct that Wellmark did regularly grant plaintiffs' claims for benefits from their providers prior to July 2013,[16] what plaintiffs have not shown is that Wellmark failed to interpret the Plan's language consistently. *See Smith v. United Television, Inc. Special Severance Plan*, 474 F.3d 1033, 1037 (8th Cir. 2007) (analyzing the *Finley* factors and concluding that the claimant failed to show that the plan administrator's interpretation of the relevant plan language was inconsistent).

---

[15] Although plaintiffs state that their argument here is not an estoppel argument, Docket 53 at 13, the Eighth Circuit has previously observed that a plan administrator's decision to deny benefits receives little or no deference when the denial is based on the exact same information that was previously used to grant benefits. *See Gunderson v. W.R. Grace & Co. Long Term Disability Income Plan,* 874 F.2d 496, 500 (8th Cir. 1989) (declining to give deference to a plan administrator's decision "to use the same evidence which once supported its finding of disability" to later support a finding, "applying the same definition of disability," that there was no disability). More recently, however, the Eighth Circuit has instead indicated that a plan administrator's decision to deny benefits without newly presented evidence is a circumstance for the court to consider in its analysis. *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002) ("We are not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments.").

[16] As mentioned previously, the Supplement to the Administrative Record does reflect that some of the claims submitted by plaintiffs' from these providers were granted by Wellmark after July 2013. *E.g.,* SAR at 22-23, 33-35.

For plaintiffs to prevail under this factor they would need to show that Wellmark inconsistently interpreted phrases from the Coverage Manual, such as "medically necessary" or "experimental or investigational." But as reflected in the Administrative Record, plaintiffs cannot show that Wellmark inconsistently interpreted the terms of the Coverage Manual. Instead, for each final claim denial that Wellmark made, Wellmark explained to plaintiffs the reason for the denial and provided to plaintiffs Wellmark's definition of the relevant language of the Coverage Manual. *E.g.* AR at 229 (final adverse benefit notification that defines what a "medically necessary" health care service is under the Plan); AR at 798 (final adverse benefit notification that defines when treatments are "investigational or experimental" under the Plan). Thus, accounting for the fact that Wellmark previously awarded benefits to plaintiffs for some of the same types of claims that it later declined to award benefits for, *McOsker*, 279 F.3d at 589, a review of the Administrative Record demonstrates that because Wellmark did not interpret *the language* of the Coverage Manual differently the court concludes that this factor ultimately weighs in Wellmark's favor.[17]

### III. What is the Impact of Wellmark's Conflict of Interest?

Because Wellmark is responsible both for evaluating claims and awarding benefits for those claims, *see* AR at 169, the court must consider

---

[17] Even if the court concluded that this factor did not weigh in Wellmark's favor, it is clear that the balance of the *Finley* factors, *see Finley* 957 F.2d at 621, weigh in Wellmark's favor and that Wellmark's decisions on plaintiffs' internal appeals were reasonable.

what impact, if any, this conflict of interest had on Wellmark's decisions. *Glenn*, 554 U.S. at 112; *see also Khoury*, 615 F.3d at 953 (explaining that "the existence of a conflict of interest is 'one factor among many that a reviewing judge must take into account' when determining whether a plan administrator has abused its discretion in denying benefits" (quoting *Glenn*, 554 U.S. at 116)). Here, plaintiffs do not explicitly argue that Wellmark's dual role impacted its decision to award or deny benefits on plaintiffs' 26 internal appeals. But as post-*Glenn* case law makes clear, the court is still required to give Wellmark's conflict some weight. *Khoury*, 615 F.3d at 953. Because the factors warranting finding an abuse of discretion are not close, the court concludes that Wellmark's conflict was not so serious as to impact its decision on plaintiffs' internal appeals. Thus, Wellmark's conflict here is given little weight.

## CONCLUSION

In sum, Wellmark's decisions on the plaintiffs' 26 internal appeals were "based on a reasonable interpretation of the Plan and [were] supported by substantial evidence." *Hampton*, 769 F.3d at 600. Thus, the court concludes that Wellmark did not abuse its discretion in denying the plaintiffs' 26 internal appeals. Therefore, under the standard of review applicable in this case, the court will not disturb Wellmark's final determinations. Thus, it is

ORDERED that plaintiffs' motion for summary judgment (Docket 42) is denied.

IT IS FURTHER ORDERED that Wellmark's motion for summary judgment (Docket 50) is granted.

IT IS FURTHER ORDERED that each party shall bear its own fees and costs.

DATED June 29, 2017.

BY THE COURT:

*/s/ Karen E. Schreier*

KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE